# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 17, 2008

## STATE OF TENNESSEE v. JAMES EDWARD FARRAR, JR.

**Appeal from the Circuit Court for Bedford County**
**No. 16183     Lee Russell, Judge**

---

**No. M2007-02006-CCA-R3-CD - Filed October 15, 2008**

---

The defendant, James Edward Farrar, Jr., appeals from his Bedford County Circuit Court jury conviction of bribing a witness. He claims that the verdict is not supported by legally sufficient evidence and that the trial court erred in admitting into evidence a compact disc containing recorded telephone calls that the State failed to properly authenticate. Because we disagree, we affirm the judgment of the trial court

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J.C. McLIN, JJ., joined.

John H. Norton, III, Shelbyville, Tennessee, for the appellant, James Edward Farrar, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Charles F. Crawford, Jr., District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On January 22, 2007, the Bedford County Grand Jury indicted the defendant on one count of bribing a witness, *see* T.C.A. § 39-16-107 (2006), and one count of conspiracy to bribe a witness, *see id.* § 39-12-103. The State charged that the defendant attempted to induce Amy Merlo, a subpoenaed witness, to be absent from the trial of *State of Tennessee v. Mark A. Buntley* in the Circuit Court of Bedford County, in order to prevent her from testifying against Mark Buntley. The State alleged that the defendant offered to pay Ms. Merlo's bond if she were arrested for contempt of court and the he further offered money to Ms. Merlo so she would leave town on the day of trial. After a two-day trial by jury, the jury returned a verdict of guilty on the count of bribery, a Class C felony, and acquitted the defendant on the count of conspiracy to commit bribery. The defendant was sentenced to six years' imprisonment as a standard offender with a standard release eligibility.

The defendant filed a timely appeal and challenges his conviction on two grounds. First, the defendant asserts that the trial court erred in denying his motion in limine to prevent the introduction of a compact disc containing recorded telephone conversations between Mr. Buntley, Ms. Merlo, and the defendant. Second, the defendant challenges the sufficiency of the evidence to sustain his conviction of bribing a witness.

*Motion in Limine*

The defendant takes issue with the admission into evidence of a series of telephone calls, re-recorded on compact disc, in which the defendant and Mr. Buntley spoke with Ms. Merlo regarding Mr. Buntley's trial. The calls originated from the Bedford County Workhouse (the workhouse) where Mr. Buntley was in custody prior to his trial for aggravated burglary and theft.[1] The compact disc offered as evidence contained recordings of calls made by Mr. Buntley to the defendant when the defendant used "three-way calling" to include Ms. Merlo in the conversations. The defendant moved in limine and argued that the recorded telephone conversations, copied to compact disc, were not properly authenticated and were therefore inadmissible.

In the motion hearing, the State called Lieutenant Trey Arnold of the Bedford County Sheriff's Department to testify about the telephone system at the workhouse. Lieutenant Arnold testified that he had worked for the department for approximately 11 years. His primary duty was the administration of the Bedford County Jail; however, he also managed technology for the entire department, including the workhouse. He testified that the workhouse was divided into "blocks," with each block having its own telephone. Inmates were permitted to make outgoing calls, but the person receiving the call must accept the telephone charges, much like a "collect" telephone call. The workhouse leased a technology system (the system) from Securus Technologies, a company based in Irving, Texas. The system digitally recorded all telephone calls made from the workhouse to a hard drive. When an inmate initiated a call, the system played a pre-recorded message that informed both the caller and the recipient that the call was subject to monitoring and recording.

Lieutenant Arnold testified that he often received requests from various law enforcement entities to find recordings of inmates' telephone calls. To find a recorded telephone call, Lieutenant Arnold testified that he used a computer query function that allowed him to search the hard drive according to the outgoing dialed number and the range of dates in which the call was placed. He stated that the system produced a record of all completed outgoing telephone calls and all attempted outgoing telephone calls. The record included the date and time that the call was placed and the receiving, or "target," telephone number. Upon finding the requested call, he could use the system to re-record the call onto a compact disc.

---

[1]Bedford County has two facilities to house inmates: the Bedford County Jail and the Bedford County Workhouse. The workhouse had been operating for two or three years at the time of trial. Both facilities are operated by the Bedford County Sheriff's Department. In the case at hand, Mr. Buntley was housed at the workhouse at all times.

Lieutenant Arnold testified that the system had been used at the jail for approximately eight years and had been used at the workhouse since it first opened two or three years prior to trial. He testified that, to his knowledge, the system never had any problems recording conversations. He added that the system, to his knowledge, had never failed to record a telephone call. He never learned of any discrepancies between the digital hard drive recording and the re-recording ultimately written to the compact disc. Further, he testified that he had no ability to edit, delete, or re-record portions of the recorded telephone calls.

On cross-examination, Lieutenant Arnold admitted that he was never specially trained at any formal school to operate the system. He testified that Securus Technologies installed and serviced the system and that he had never personally participated in any maintenance work. He stated that he could not testify to the "engineering side" of the system and that he was not familiar with the technology involved in the system. He acknowledged that he could not testify to an absolute certainty that the software had never failed. Lieutenant Arnold did not know of any "safeguard mechanisms" or the "failure rate" of those mechanisms. Lieutenant Arnold also testified that the department did not monitor any calls in real time and solely relied on the system's records and the digital recordings. He never compared the compact disc playback to the recording stored on the hard drive in the present case and could not testify with certainty that the re-recording was accurate.

Lieutenant Arnold testified that on January 9, 2007, Detective Brian Crews contacted him and asked whether any calls had been made to the telephone number assigned to "Deals on Wheels," an automobile dealership in Shelbyville owned by the defendant. Lieutenant Arnold searched the system and found that on January 2 and 8, 2007, Mr. Buntley made six telephone calls from the workhouse to "Deals on Wheels." Lieutenant Arnold re-recorded these telephone calls onto a compact disc and delivered it to Detective Crews. The defendant moved to exclude these recordings, arguing that Lieutenant Arnold's testimony failed to properly authenticate the compact disc.

In the hearing, the defendant argued that pursuant to Tennessee Rule of Evidence 901(b)(9), the workhouse's call management system "involves a process or a system," and thus "evidence describing a process or system used to produce a result" required a "showing that the process or system produces an accurate result." The defendant argued that Lieutenant Arnold was not qualified to testify about the system's ability for producing accurate recordings because he did not know the failure rate of the software, whether the recordings could be edited, or whether the compact disc accurately depicted the original recording. The defendant maintained that only a representative from Securus Technologies could properly testify to the accuracy and reliability of the recording process of the system, and without such testimony, the compact disc could not be authenticated.

The State argued that nothing in the testimony showed any problem with the system. Further, the State posited that the defendant's reliance on Tennessee Rule of Evidence 901(b)(9) was misplaced. The State reasoned that this rule applies to processes and systems such as DNA testing

and did not apply to simply accessing recorded files. The State argued that because Securus's system was not new, sophisticated technology, independently showing its reliability was unnecessary.

The court found that the State had sufficiently authenticated the evidence. The court opined, "It's not new technology. It's not junk technology. It's very familiar technology." The court also reasoned that the jury will "hear certain questions about the evidence and they can weigh the evidence." The trial court overruled the motion in limine.

*The Trial*

During the trial, the State first called Lieutenant Arnold, who gave testimony very similar to his testimony during the hearing on the motion in limine. He gave a brief description of how the system worked and how Detective Crews had asked him to search for telephone calls made from the workhouse to the defendant's automobile dealership between January 1 and 8, 2007. Through his testimony, the State introduced the compact disc and the record of the six telephone calls as exhibits to trial.

The State next called Detective Crews, who testified that he had worked for the City of Shelbyville Police Department for more than seven years and had been a criminal investigator for approximately five years. He testified that his involvement with the case started in 2006 when he investigated a burglary incident that ultimately led to the indictment of Mr. Buntley on aggravated burglary and theft charges. He testified that he had spoken with Ms. Merlo and her son, Skyler, who was approximately ten years old, about testifying in Mr. Buntley's trial. He advised Ms. Merlo that she was under subpoena to be present at court at 9:00 a.m. on January 9, 2007, and the two made arrangements for Skyler to arrive at court at 1:00 p.m. due to his school schedule.

Detective Crews testified that at 9:00 a.m. on January 9, 2007, all witnesses were present at Mr. Buntley's trial except for Ms. Merlo. He assigned members of the police department to search for Ms. Merlo. She could not be found, and the trial against Mr. Buntley had to be continued to a later date. Detective Crews testified that, later that day, Ms. Merlo was brought into custody. He interviewed Ms. Merlo, and the information he learned from speaking with her led him to request from Lieutenant Arnold any telephone calls made from the workhouse to the defendant's automobile dealership before Mr. Buntley's trial.

Detective Crews testified that he received a compact disc from Lieutenant Arnold with six telephone conversations recorded on it. He testified that he recognized the voice of the defendant, as well as the voices of Mr. Buntley and Ms. Merlo, from the recordings. Detective Crews stated that the defendant and Mr. Buntley were first cousins. He testified that the defendant's father owned and operated a bail bond company, Farrar Bonding, at the time the telephone calls were made. He also stated that the defendant used the nickname "Blue."

During Detective Crews's testimony, the compact disc was played in full to the jury. The recordings revealed the following information:

On January 8, 2007, Mr. Buntley called the defendant and discussed his pending trial and the charges he was facing. Mr. Buntley told the defendant, "I think old Amy [Merlo]'s gonna be up there testifying against me." Mr. Buntley could not directly contact Ms. Merlo from the workhouse because she had placed a "block" on her telephone, which prevented her from receiving "collect" telephone calls. However, the defendant utilized a three-way calling feature during his telephone calls with Mr. Buntley to connect with Ms. Merlo. Thus, the defendant, Mr. Buntley, and Ms. Merlo effectively had a series of three-person conference calls. Five telephone calls were made on January 8. The following conversation took place during the first telephone call at 11:55 a.m.:

> MR. BUNTLEY: Hey, you coming to court to testify against me tomorrow, ain't you?
> MS. MERLO: Mark?
> MR. BUNTLEY: Yeah.
> MS. MERLO: I'm not like trying to do all that, but I mean, but they -- they come over and they like (inaudible) and I'm gonna have to do this or this is going to happen. And they talked to Skyler.
> . . . .
> They wanted to talk to him. I didn't really have a choice they could subpoena me anyway and there wasn't nothing I could do about it.
> . . . .
> MR. FARRAR: This is Blue. You ain't going up there to testify against him, are you?
> . . . .
> MS. MERLO: No, [I]'m not testifying against him, but my son will be.
> MR. BUNTLEY: They're gonna call you to testify tomorrow. You know that, don't you?
> MS. MERLO: Yes, Mark.
> MR. FARRAR: I mean, hell, Amy, you don't know nothing, though, do you?
> . . . .
> I mean, the boy's going to get royally f[---]ed tomorrow if somebody don't act right.
> MS. MERLO: Blue, I know what the f[---]'s going on. I know what I'm doing, too.
> . . . .
> You act like I'm going to come up there and f[---]ing go -- just like tell all this shit, and I'm not.

Mr. Buntley placed the second call at 12:10 p.m. Before the defendant used three-way calling to contact Ms. Merlo, the following exchange took place between Mr. Buntley and the defendant.

MR. FARRAR:  Lord, she's gonna royally screw you tomorrow.

MR. BUNTLEY:  I know it, man.  It's f[---]ed up.  I had a f[---]ing gut feeling she was going to do that shit.

After some discussion, the defendant called Ms. Merlo again.  Upon Mr. Buntley telling Ms. Merlo that he could face several years of imprisonment on the charges, she responded:

MS. MERLO:  Well, I wasn't even going to go and they said they could get me for contempt of court.

. . . .

MR. BUNTLEY:  You're gonna have to show up now.

MR. FARRAR:  Well --

MR. BUNTLEY:  They can't -- they can't make Skyler get on the stand.

MR. FARRAR:  Mark, Mark.  As far as Amy and him, they don't have to show up tomorrow.  They can't get in no trouble, neither.

. . . .

They -- they tell you that kind of shit, Amy, to scare you.  I ain't taking up for Mark or nothing but he needs some help.

MR. BUNTLEY:  Yeah, I need all the help I can f[---]ing get right now.

MR. FARRAR:  Well, the best thing to do is not show up tomorrow.

. . . .

They arrest you, I'll come up there and make your bond for free.

MS. MERLO:  Well, you better damn it.

MR. FARRAR:  You just don't go up there tomorrow.

MS. MERLO:  Then I'm going to be violated.

MR. FARRAR: You call me.

. . . .

MS. MERLO:  I probably just won't even show up Mark.

MR. FARRAR:  That'll be the best thing, to help him out.

The defendant and Mr. Buntley were unable to reach Ms. Merlo during Mr. Buntley's third call on January 8.  However, the defendant told Mr. Buntley that he planned to give Ms. Merlo and Skyler $50 and send them to Nashville.  He also proposed to send somebody with them.  The fourth call of the day started at 2:51 p.m.  The defendant once more stated, "But if you go to jail, we'll make your bond.  It won't cost you a nickel.  But more or less they probably won't even do that.  That's at the most."  Also, during this conversation the defendant and Mr. Buntley confirmed that Ms. Merlo had signed a subpoena and was legally obligated to arrive at court the following day.  The following conversation took place while the defendant was not on the telephone line.

MS. MERLO:  I'm not gonna be there!  I'm not gonna be there!  I've already got plans, I already know where I'm going to hide out where

-6-

they won't find me. And then at 3:00 I'm going to go up there and turn my self [sic] in before I go to work so I can get somebody to bond me out.

MR. BUNTLEY: Amy, you're not going to be charged with nothing, man.

MS. MERLO: Well, I'm just not going to be at work and them mother-f[---]ers come up there and get me, because I'll lose my job. And I just made manager and everything and I ain't f[---]ing trying to do all this shit.

MR. BUNTLEY: Blue said he was going to give you a hundred dollars and tell you to go to Nashville.

. . . .

MS. MERLO: A hundred dollars to go to Nashville? What the f[---] is a hundred dollars going to do for me?

After Detective Crews's testimony and the playback of the compact disc, Ms. Merlo testified on behalf of the State. She testified that she dated Mr. Buntley and lived with him for a period of time. Their relationship ended shortly after he went to jail. She stated that Mr. Buntley was the father of her daughter, Lily, who was two years old at the time of trial. She testified that she had told Detective Crews that she and her son, Skyler, would testify against Mr. Buntley on January 9, 2007. She agreed to be at court at 9:00 a.m. and she arranged for Skyler to be at court at 1:00 p.m.

Ms. Merlo testified that prior to January 8, she had planned to be at court for Mr. Buntley's trial as a witness for the State. She told the court that she changed her mind about testifying because "[Mr. Buntley] was just like, well, you know, they offered me 14 years. And he made me feel bad. You know, I mean, I still loved him." She testified that she was merely telling Mr. Buntley what he wanted to hear when she stated during the recorded calls that she had never planned to testify. Ms. Merlo ultimately testified against Mr. Buntley at trial on March 29, 2007.

Both parties stipulated that Ms. Merlo was subpoenaed by the State to Mr. Buntley's trial set for 9:00 a.m. on January 9, 2007. The subpoena was issued on December 21, 2006, and Ms. Merlo was served on December 28. A copy of the subpoena was entered into evidence.

The State then re-called Detective Crews to testify that he arrested the defendant. After the grand jury had indicted the defendant, he located the defendant and notified him of the charges brought against him. He informed the defendant that the bribery charges stemmed from his offering compensation to Ms. Merlo and offering to make her bond if she was arrested for failing to show at court. Detective Crews testified that the defendant responded, "[W]ell, I guess I'm guilty of that. I offered to make her bond for free."

The State rested its case. No defense proof was offered, and the defendant chose not to testify. Based upon the evidence as summarized above, the jury convicted the defendant of bribing a witness and acquitted the defendant of conspiracy to bribe a witness.

On appeal, the defendant challenges the admission of the compact disc containing the recorded telephone calls and the sufficiency of the evidence supporting his conviction. We will analyze each in turn.

*I. Admission of the Compact Disc containing Recorded Telephone Calls*

The defendant contends that the trial court erred by admitting into evidence a compact disc containing the re-recording of six telephone calls placed by Mr. Buntley to the defendant. The defendant asserts that the compact disc is a "duplicate" recording of the calls under Tennessee Rule of Evidence 1001(4) ("A 'duplicate' is a copy produced . . . by . . . electronic re-recording . . . ."). "A duplicate is admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original." Tenn. R. Evid. 1003. The defendant argues that a genuine issue exists as to the authenticity of the original because the call management system recordings cannot be authenticated. This argument, in turn, requires analysis pursuant to Tennessee Rule of Evidence 901, which governs the authentication of evidence.

The defendant relies on Tennessee Rule of Evidence 901(b)(9), alleging that the State cannot show that the telephone call management system at the workhouse produced an accurate re-recording of the original telephone calls. The State insists that it has met its burden of authentication and that the compact disc is admissible.

Generally, questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). Authentication of evidence is governed by Tennessee Rule of Evidence 901, which provides in pertinent part as follows:

> (a) General Provision.
> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims.
>
> (b) Illustrations.
> By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
>
>     . . . .

-8-

(9) Process or System.
Evidence describing a process or system used to produce a result and
showing that the process or system produces an accurate result.
. . . .

Tenn. R. Evid. 901. As noted above, Rule 901(b)(9) is for "illustration only." Tenn. R. Evid. 901(b). Moreover, the Advisory Commission Comments to Rule 901 provide that "[s]ubsection (b)(9) treats authentication of computer documents." *Id.*, Advisory Comm'n Comments. The defendant insists, however, that Rule 901(b)(9) serves as the only means of authentication for the compact disc. We disagree.

Another means of authentication of evidence pertinent to this case is described by subsection (b)(5), "Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Because the State has met the requirements of Rule 901(b)(5), there is no need to further analyze whether the compact disc is proper pursuant to Rule 901(b)(9).

Detective Crews testified that he listened to the six calls on the compact disc. He stated that he could recognize the voices of the defendant, Mr. Buntley, and Ms. Merlo from the recordings. On three occasions he testified that he was certain he could recognize the defendant's voice. This testimony suffices to authenticate the compact disc under Rule 901(b)(5).

For the above stated reasons the trial court did not abuse its discretion in permitting the playback of the compact disc to the jury.

*II. Sufficiency of the Evidence of Bribing a Witness*

In his challenge to the sufficiency of the evidence of bribing a witness, the defendant maintains that the evidence fails to show that the defendant ever intended to induce or actually induced Ms. Merlo to be absent from Mr. Buntley's trial. The defendant argues that "nothing that was discussed during his conversations with Ms. Merlo 'induced' her not to appear as a witness against Mr. Buntley," and that Ms. Merlo had "consistently indicated to both [the defendant] and Mr. Buntley that she did not intend to appear as a witness against Mr. Buntley." Further, the defendant maintains that the evidence shows that Ms. Merlo was not actually induced by the defendant and that the defendant's actions had no actual bearing on Ms. Merlo's decision not to attend trial.

A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict because a guilty verdict destroys the presumption of innocence and replaces it with a presumption of guilt. *See State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court must reject a defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light

most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Issues of the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. This court may not substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See Evans*, 108 S.W.3d at 236-37; *Carruthers*, 35 S.W.3d at 557.

As applicable in the present case, bribery of a witness occurs when a person "[o]ffers, confers or agrees to confer anything of value upon a witness or a person the defendant believes will be called as a witness in any official proceeding with intent to . . . . [i]nduce the witness to be absent from an official proceeding to which that witness has been legally summoned." T.C.A. § 39-16-107(a)(1)(C) (2006).

The evidence in the present case, in the light most favorable to the State, showed that the defendant utilized three-way calling to connect Mr. Buntley and Ms. Merlo. He clearly participated in conversations about Mr. Buntley's trial, including whether Ms. Merlo should testify. He told Ms. Merlo that she should "act right" or else Mr. Buntley could face tremendous jail time. When Ms. Merlo voiced her concerns about being arrested for contempt and losing her job, the defendant offered to pay her bond "for free." On another occasion he stated, "But if you go to jail, we'll make your bond. It won't cost you a nickel." The evidence showed that the defendant's father owned a bail bonding business at the time. The defendant also told Mr. Buntley that he would give Ms. Merlo money to leave town, which Mr. Buntley later repeated to Ms. Merlo. The telephone conversations also show that the defendant knew that Ms. Merlo was under subpoena, but that he nevertheless attempted to influence her to be absent at trial. When Detective Crews arrested the defendant, the defendant stated, "[W]ell, I guess I'm guilty of that. I offered to make her bond for free."

The defendant argues that Ms. Merlo had already stated her intention not to testify *before* the defendant offered anything of value to her, therefore nothing he could do would "induce" her. He argues that Ms. Merlo made clear her intentions to absent herself from trial during the first January 8, 2007 telephone call and that the defendant's later offer to pay her bond was merely a "comment." However, the evidence, viewed in the light most favorable to the State, shows that the defendant did not believe Ms. Merlo's representations that she would not show to trial. After the first conversation with Ms. Merlo, the defendant told Mr. Buntley, "Lord, she's gonna royally screw

you tomorrow." Further, Ms. Merlo testified that, prior to the January 8 telephone calls, she had planned to testify.

The defendant's contention that his actions did not actually induce Ms. Merlo to not show at trial is unavailing. The statute for bribing a witness clearly defines the offense as offering anything of value with *intent* to induce. *See id.* § 39-16-107(a)(1)(C). Intent to induce is sufficient to meet the elements of the offense. Ms. Merlo's failure to be present at trial for reasons other than the defendant's offers is irrelevant. A rational trier of fact could find that the defendant offered something of value, whether it was money to go to Nashville or a free bond, to a witness that he knew to was legally summoned, with the *intent* of inducing her to not testify at the trial against Mr. Buntley. Thus, a reasonable trier of fact could have found the defendant guilty of bribing a witness, and whether his offers actually succeeded in inducing Ms. Merlo is of no consequence.

Thus, following the well-settled rules governing our review of the sufficiency of the convicting evidence, we affirm the defendant's bribery of a witness conviction.

### III. Conclusion

Because the record supports the trial court's admission of the compact disc into evidence and because the evidence presented in the trial court is sufficient to support the conviction, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE